Filed 4/6/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.H., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Appellant, v. T.H. et al., Defendants and Respondents; E.W., Objector and Appellant. | A151964 (Alameda County Super. Ct. No. OJ16026569) |

The Alameda County Social Services Agency (the agency) and E.W. appeal an order denying their request that one-year-old M.H. be moved from his current non-relative foster home to the Minnesota home of his maternal great-aunt (E.W.). They contend the court erred by disregarding the statutory preference for relative placement (Welf. & Inst. Code,[1] § 361.3) and by relying instead on the statutory preference for caretaker placement (§ 366.26, subd. (k)). We conclude that neither statutory preference was applicable in this instance and that faced with the difficult decision between two potentially beneficial homes, the court did not abuse its discretion in deciding that a change in placement would not be in the child's best interest. Accordingly, we shall affirm the order.

---

[1] All statutory references are to the Welfare and Institutions Code.

1

**Factual and Procedural Background**

On April 18, 2016, M.H. was born with a positive toxicology screening for methamphetamine and cocaine. On April 22, the agency filed a petition for dependency jurisdiction pursuant to section 300, subdivisions (b) and (g). The petition alleged that mother has a history of substance abuse and psychiatric illness that impairs her ability to care for the child. The identity of the child's father was unknown. On April 25, the minor was detained and placed in the foster home where he remains to this date. On May 9, the court sustained the allegations of the petition and ordered reunification services for mother. A six-month review hearing was set for October 27.

In its status report prepared for the six-month review hearing, the agency recommended that the minor remain a dependent of the court and that mother's reunification services be terminated. The report advised that the great-aunt E.W., who resides in Minnesota, had expressed an interest in having the minor placed with her. The report states that on July 13, 2016, the child welfare worker initiated a request pursuant to the "Interstate Compact on the Placement of Children" (the compact) for the minor to be placed with E.W. in the State of Minnesota. The Minnesota contact person informed E.W. that to be considered as a placement option she would need a license that would take four to six months to obtain. On October 27, the matter was continued to January 12, 2017, for a contested hearing.

In an addendum report filed January 6, 2017, the child welfare worker explained that M.H. was currently placed in a "concurrent foster home" (one in which the caretakers seek to adopt the minor, formerly referred to as a "fost-adopt placement") but that E.W. was still being assessed for placement in Minnesota. The report states that "If the maternal aunt passes the approval assessment, [the agency] will make a decision with regard to [M.H.'s] placement, considering his best interest."

At the January 12, 2017 contested hearing, the court terminated the mother's reunification services and scheduled a section 366.26 hearing for May 4, 2017.

On February 14, the agency filed an interim review report indicating that E.W's home in Minnesota had been approved and that it expected a change of placement to

E.W.'s home would take place within the next few months. Minor's attorney objected to the change of placement and the parties agreed to combine a contested hearing on placement with the section 366.26 hearing, previously scheduled for May 4, 2017. The court ordered that M.H. not be moved before the hearing. The court also granted the current foster parents the status of de facto parents and appointed counsel for them.

The agency's section 366.26 report recommended that the court terminate parental rights and order a plan of adoption by E.W. The report described M.H. as a happy child with a positive relationship with his foster family. The agency reported that the child had demonstrated his ability to bond and attach through his relationship with his foster family, and the agency believed he would transfer those feelings of love and connection to E.W., the proposed adoptive parent. The report explained that in March, after the compact was approved, E.W. and two additional maternal relatives had traveled to the Bay Area to meet M.H. Over the course of five visits, the child presented as comfortable and was observed to reciprocate loving gestures, including eye contact, with E.W. According to the agency, during the visits, E.W. demonstrated she is able to care for the child and provide a loving home. She has raised five children who are now adults and has close ties to her grandchildren and extended family members. E.W. traveled to the Bay Area for the hearing in May and returned in June when the section 366.26 hearing was continued.

At the hearing on June 16, the child welfare worker acknowledged concerns regarding M.H.'s change in placement, but opined that with proper support and services the child would overcome the grieving process and settle into his new placement. He also testified that he had considered the minor's culture, heritage, and life-long family connections when making his recommendation that M.H. be placed with E.W. He explained that as a child grows older, knowing family is quite important for children who are not raised by their biological parents. He also noted that M.H. is African-American and his foster family is not. While he had no reason to suspect that the foster family would not cooperate with the agency and make an effort to expose M.H. to his heritage

and culture, he felt that by placing M.H. with E.W. he would acquire his cultural heritage through his biological family.

E.W. testified that she contacted the agency by telephone when M.H. was two days old to express her interest in adoption. When the agency contacted her approximately six weeks or two months later, she reaffirmed her interest in taking placement. She did not come for a visit before the compact was approved because she was "waiting for permission" from the social worker. She testified that she is 66 years old and in good health. She has five adult children, two of whom also live in Minnesota with her two grandchildren, with whom she has a close bond. They spend every-other Sunday and most holidays together. She has a private bedroom in her home prepared for M.H. She testified that before retiring, she ran a child care center for six years and that she was a foster parent for around two years.

Following the presentation of evidence, minor's counsel and counsel for the de facto parents argued it was in M.H.'s best interest to remain in his current foster placement. The agency's counsel and mother's counsel argued that M.H. would bond with E.W. and that it was in his best interest to be placed with a biological relative.

Ultimately, the court rejected the proposed change in placement. The court found that the child was thriving in his placement with the foster family and that he considers them his parents. With respect to E.W., the court stated, "The aunt . . . is a 66-year-old woman. She lives alone. She has raised five children, and it's been noted that she's got quite a lot of family. I believe this argument has been made in support of [M.H.] going to Minnesota to be part of this big family. Of her five children, four live out of state. The court infers that those people would not be around on a daily basis. She does have one daughter who is present in her area and also a 14-year-old granddaughter. I don't know the affiliation between [E.W.] and this child. I do know that Welfare and Institutions Code section 361.3 doesn't include her in their relative preference placement consideration. She is not a relative that's a part of that statute as it doesn't appear to include any paternal great aunt. [¶] [E.W.] has shown us that she had worked very hard in working on the [compact] and had done whatever testing that she needed to do to get this

4

child in her custody. The court finds it very interesting that knowing she had a relative, a baby born in California, she did not come immediately to see this child given that she appeared to all of us to be quite the go-getter in order to gain what she thought would be custody of this little boy. Her excuse was — well, she was waiting to be invited here. The court has concerns with that. [¶] [E.W.] also discussed her belief as to [M.H.'s] ability to get over the fact that he's got a family here in California. She believes that after two or three days he'll be over it. The evidence points otherwise. . . . [¶] I am surprised given the fact that she apparently has a history of working in foster care that, for lack of a better term, she is so naïve about the emotion bond that this child has with his foster parents. It has been raised that she should go to Minnesota because he's African-America and his foster family is Caucasian. In this day and age it is no longer unusual in any sense to see multi-racial families at all. In fact, it's quite the norm. [¶] [The social worker] was asked on examination whether he believed that [the foster family] would spend time with [M.H.] and make available to him activities or — I don't know, books or whatever in his heritage and race. [The social worker] agreed or . . . had no reason to believe that [the foster parents] would not do that. Moreover, the [foster parents] have gone out of their way to identify brothers that I don't believe even the agency had identified, and they've made attempts or are going to make attempts to introduce [M.H.] to his brothers. [¶] . . . [¶] . . . So what we have is a 66-year-old aunt. The court is unsure of the relationship between the aunt and this child, but suffice it to say that there's an unattenuated link somewhere. This court finds that Welfare and Institutions Code section 366.26 (k) applies and that it is in [M.H.'s] best interest to stay in his placement."

After ruling on placement, the court turned to section 366.26, offering the parties the opportunity to present argument relating to the termination of parental rights. Mother's counsel objected but submitted, noting there was no evidence supporting a defense to the termination of parental rights. The court ordered parental rights terminated and elevated the foster parents to proposed adoptive parents. The agency and E.W. filed timely notices of appeal from the denial of their request for a change in placement.

**Discussion**

1. *Relative placement preference was not applicable.*

Section 361.3 gives "preferential consideration" to a request by a relative of a child who has been removed from parental custody for placement of that child. " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (*id.*, subd. (c)(1).) The preference applies at the disposition hearing and thereafter "whenever a new placement of the child must be made." (*id.*, subd. (d); see *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285 ["[S]ection 361.3 assures interested relatives that, when a child is taken from her parents and placed outside the home pending the determination whether reunification is possible, the relative's application will be considered before a stranger's application."].)

The relative placement preference was inapplicable here. At the time of the hearing, as the trial court observed, section 361.3 did not include a great aunt as a "relative" entitled to the statutory preference. Under section 361.3, subdivision (c)(2), as it now reads, " 'Relative' means an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons even if the marriage was terminated by death or dissolution." However, at the time of the hearing, section 361.3, subdivision (c)(2) included the limitation that "only the following relatives shall be given preferential consideration for the placement of the child: an adult who is a grandparent, aunt, uncle, or sibling." (Stats. 2016, ch. 612, § 71, eff. Jan. 1, 2017.)[2] This sentence was eliminated by an amendment that became effective January 1, 2018. (Stats. 2017, ch. 732, § 47, eff. Jan. 1, 2018.) Moreover, the preference is applicable after disposition only when a new

---

[2] We find no support for E.W.'s argument that this limitation on preferential consideration applied only to placement contests involving relatives of different degrees. To the contrary, under section 361.3, subdivision (b), "In any case in which more than one appropriate relative requests preferential consideration pursuant to this section, each relative shall be considered under the factors enumerated in subdivision (a)."

placement is necessary. (*In re Lauren R*. (2007) 148 Cal.App.4th 841, 854.) Because M.H. was by all accounts bonded to his foster parents and happy in his current placement, no new placement was necessary.

It is unfortunate that in circumstances like those here, in which an out-of-state relative expresses interest in placement shortly after removal but is unavailable for immediate placement for reasons beyond the relative's control, the preference for relative placement can be frustrated. In this case the dependency proceedings initially moved very quickly because there was little chance of family reunification, but the minor's bonding with the non-relative foster parent was permitted to strengthen over the course of numerous continuances. As a result, while E.W.'s home was approved for placement in January, the dispositive hearing was not held until six months later, in June. As the court explained in *In re Lauren R*., *supra*, 148 Cal.App.4th at page 855, "[t]he overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child. '[R]egardless of the relative placement preference, the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected.' [Citation.] Section 361.3 does not create an evidentiary presumption that relative placement is in a child's best interests. [Citation.] The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests."

## 2. *Caretaker placement preference was not applicable.*

Section 366.26, subdivision (k) provides: "(1) Notwithstanding any other provision of law, the application of any person who, as . . . foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the . . . foster parent and removal from the . . . foster parent would be seriously detrimental to the child's emotional well-being.

[¶] (2) As used in this subdivision, 'preference' means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child."

Although the rationale underlying the caretaker preference undoubtedly applies in the present situation, strictly construed, the statutory language renders the section 366.26, subdivision (k) preference inapplicable in this instance. When the placement decision was made, the court had neither approved a permanent plan for adoption of M.H. nor freed him for adoption. The termination of reunification services is not sufficient to trigger the statutory preference. (*In re Lauren R., supra*, 148 Cal.App.4th at p. 856 ["Subdivision (k) sets forth alternative bases for the application of the caretaker preference: It applies to a person who is caring for a child 'for whom the court has approved a permanent plan for adoption, or who has been freed for adoption.' "].) Moreover, section 366.26, subdivision (k) merely gives preference in time for the processing of the current caregiver's application by the agency "but does not necessarily mandate that other applications will not also be considered." (*In re Harry N.* (2001) 93 Cal.App.4th 1378, 1397.)

### 3. *The court did not err in denying the agency's proposed change in placement*.

"At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interest of the child. [Citations.] [¶] After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The trial court's determination that the

proposed change in placement was not in the child's best interest will not be disturbed unless an abuse of discretion is clearly established. (*Id.* at p. 318; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034 [When placement decision is made prior to termination of parental rights, the court has "the power and the duty to make an independent placement decision."].) [3]

Placement in this case presented an unusually difficult question. The court was faced with two good options: both the de facto parents with whom the minor had lived since shortly after birth and the great aunt who cared for the minor appeared willing and able to provide the minor with a loving home. E.W. offered the minor important biological family connections, but the minor had already bonded with the de facto parents. In weighing the relative merits of the alternatives before it, we do believe, as the agency and E.W. argue, that the court made some unfortunate factual misstatements and disparaging comments about E.W's ability to care for the minor that are not supported by evidence in the record. [4] Nonetheless, the court was fully aware of the difficulty of the choice and with the parties before it, was best able to make the hard call of which placement, under the circumstances as they then existed, was in the minor's best interests. The uncontroverted evidence was that M.H. was thriving in his current placement. Faced with the successful bonding of the minor with the de facto parents, and the uncertainty of how the minor would respond to removal from the parental figures he had known since

---

[3] The county's argument that the court's exercise of discretion was improperly constrained by its view that the section 366.26, subdivision (k) caretaker preference applied is not well taken. The record reflects the court's extensive consideration of the merits of each placement and, as explained above, nothing in subdivision (k) restricted the court from considering placements other than the current caregivers.

[4] The court incorrectly stated the size of E.W.'s family in Minnesota and dismissed the agency's argument that M.H. would benefit from being raised by his large biological family. The court faulted E.W. for not coming to visit the minor sooner than she did, suggesting that she was unreasonable in waiting for an "invitation" when, to the contrary, E.W. testified that she was waiting for "permission" from the social worker to visit. Most questionable was the court's suggestion that the agency's concern with the racial make-up of the family was unimportant because the de facto parents would make available "activities or . . . books or whatever in his heritage and race."

birth, we cannot say that the court abused its discretion in concluding that his continued placement was in his best interest.

Contrary to the agency's argument, this conclusion does not infringe on its discretion to select an adoptive home for the minor. The agency is correct that section 366.26, subdivision (j) vests the agency with broad discretion "to decide where a child should be placed after parental rights are terminated and pending adoption." (*In re Harry N., supra,* 93 Cal.App.4th at p. 1397; *Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 733 [Statutes grant "exclusive authority" to agency for "decisions on adoptive placement as well as temporary care, i.e. foster care placement pending adoptive placement."].) That discretion, however, is not unfettered. Section 366.26, subdivision (n), enacted after these decisions on which the agency relies, confers " 'on a caretaker who is a designated prospective adoptive parent standing to petition the court for a hearing on whether it is in the best interest of a child to remove that child from the caretaker's home after termination of parental rights and petition for adoption is granted.' "[5] (*Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1337-

---

[5] Section 366.26, subdivision (n)(3) reads: "Prior to a change in placement and as soon as possible after a decision is made to remove a child from the home of a designated prospective adoptive parent, the agency shall notify the court, the designated prospective adoptive parent or the current caretaker, if that caretaker would have met the threshold criteria to be designated as a prospective adoptive parent pursuant to paragraph (1) on the date of service of this notice, the child's attorney, and the child, if the child is 10 years of age or older, of the proposal in the manner described in Section 16010.6. [¶] (A) Within five court days or seven calendar days, whichever is longer, of the date of notification, the child, the child's attorney, or the designated prospective adoptive parent may file a petition with the court objecting to the proposal to remove the child, or the court, upon its own motion, may set a hearing regarding the proposal. The court may, for good cause, extend the filing period. A caretaker who would have met the threshold criteria to be designated as a prospective adoptive parent pursuant to paragraph (1) on the date of service of the notice of proposed removal of the child may file, together with the petition under this subparagraph, a petition for an order designating the caretaker as a prospective adoptive parent for purposes of this subdivision. [¶] (B) A hearing ordered pursuant to this paragraph shall be held as soon as possible and not later than five court days after the petition is filed with the court or the court sets a hearing upon its own motion, unless the court for good cause is unable to set the matter for hearing five court days after the

10

1338.) In *Wayne F.*, the court notes that the legislative history for section 366.26, subdivision (n) expressly indicates the intent to overturn *Harry N.* in explaining that "existing law does not protect the stability of children post-termination of parental rights, because the court's oversight function essentially evaporates between the order to place the child for adoption and the order granting the petition for adoption. . . . This is contrary to "the collaborative decision-making process that occurs earlier in dependency proceedings," . . . where the best interest of the child is protected at all times. [¶] . . . [The] proposed solution is to require that when the [Department of Social Services] or the licensed adoption agency recommends that a child be removed from a caretaker who wishes to adopt the child, only to be adopted by a different person, that recommendation should be reviewed by the dependency court.' " (*Wayne F.*, at p. 1338.) The trial court's determination under section 366.26, subdivision (n), that removing a child from a prospective adoptive home would not be in the child's best interest, is reviewed for an abuse of discretion. (*Wayne F.*, at p. 1341 [Statements in legislative history are "unmistakable evidence the Legislature intended to give the juvenile court the wide discretion cases such as *Harry N.* had previously afforded social service and adoption agencies."]; see also § 366.26, subd. (n)(3)(B) ["At the hearing, the court shall determine

petition is filed, in which case the court shall set the matter for hearing as soon as possible. At the hearing, the court shall determine whether the caretaker has met the threshold criteria to be designated as a prospective adoptive parent pursuant to paragraph (1), and whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest. If the court determines that the caretaker did not meet the threshold criteria to be designated as a prospective adoptive parent on the date of service of the notice of proposed removal of the child, the petition objecting to the proposed removal filed by the caretaker shall be dismissed. If the caretaker was designated as a prospective adoptive parent prior to this hearing, the court shall inquire into any progress made by the caretaker towards the adoption of the child since the caretaker was designated as a prospective adoptive parent. [¶] . . . [¶] (D) If a petition objecting to the proposal to remove the child is not filed, and the court, upon its own motion, does not set a hearing, the child may be removed from the home of the designated prospective adoptive parent without a hearing."

11

. . . whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective parent unless the court finds that removal is in the child's best interest."].)

**Disposition**

The order denying the proposed change in placement is affirmed.


                                            Pollak, J.

We concur:

McGuiness, P.J.[*]
Siggins, J.

A151964

---

[*] Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial court: Superior Court of Alameda County

Trial judge: Honorable Kimberly Briggs

Counsel for plaintiff and appellant: Donna R. Ziegler, County Counsel, Megan J. Reedy, Associate County Counsel.

Counsel for objector and appellant: Serobian Law, Inc., Liana Serobian.

Counsel for defendants and respondents: Marin Williamson

A151964